UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NO.

|  |  |
|---|---|
| MICHAEL LINDSAY, PERSONAL REPRESENTATIVE OF THE ESTATE OF JAMES LINDSAY, | ) ) ) ) ) |
| Plaintiff | ) ) |
| v. | ) ) |
| BENNET WALSH, DAVID CLINTON, VANESSA LAUZIERE, CELESTE SURREIRA, FRANCISCO URENA, MARYLOU SUDDERS, | ) ) ) ) ) ) ) |
| Defendants | ) ) ) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1.   The Commonwealth of Massachusetts made a promise to its citizen-soldiers: you take care

of us in times of conflict, and we will take care of you when you return. Although the

Massachusetts veterans residing at the Soldiers' Home in Holyoke, Massachusetts

("Soldiers' Home") kept their promise to serve their country, the Commonwealth did not

keep its promise to protect and keep them safe from harm when they were unable to care

for themselves. Instead of providing the veterans the appropriate care to which they were

entitled, the six defendants in this lawsuit showed deliberate indifference to the veteran's

basic needs. As a result of the Defendants' actions, and inactions, 76 veterans were unnecessarily infected with the deadly COVID-19 virus. Our veterans deserved better.

2.      This is a civil rights action, brough pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 by the Estate of James Lindsay ("Estate"), a veteran who died as a result of a COVID-19 outbreak at the Soldiers' Home. This case seeks to redress the needless pain, suffering, and death that this veteran endured as a result of the actions of the defendants, who were entrusted with his care, but who was denied the most basic elements of decent care, adequate treatment, and safety.

3.      Each of these six defendants acted with deliberate indifference to the risks posed by the COVID-19 pandemic, an indifference that resulted in the spread of COVID-19 throughout the Soldiers' Home. The spread of COVID-19 at the Soldiers' Home was preventable.

4.      The facts that led to the needless deaths and infections of veterans at the Soldiers' Home from COVID-19 are not genuinely in dispute. An independent investigation, commissioned by the Governor of the Commonwealth, details the unprofessional, unethical, and deliberately indifferent behavior of the five individuals primarily in charged with the care of the veterans at the Soldiers' Home, the defendants in this lawsuit. The investigation report, "The COVID-19 Outbreak at the Soldiers' Home in Holyoke: An Independent Investigation Conducted for the Governor of Massachusetts" ("Report"), attached as Exhibit 1, describes a litany of "utterly baffling" misrepresentations, misjudgments, mistakes, and blatant errors, which by any standard

amounted to a callous disregard for the health and safety of the veterans residing in the Soldiers' Home.

## PARTIES

5.   The Plaintiff, Michael Lindsay, is the Personal Representative of the Estate of James Lindsay. See Hampden County Probate and Family Court No. HS20P1610. Michael Lindsay lives in Longmeadow, Massachusetts.

6.   The Defendant, Bennett Walsh, is the former Superintendent of the Soldiers' Home in Holyoke, Massachusetts. He currently resides in Massachusetts.

7.   The Defendant, Dr. David Clinton, is the former Medical Director of the Soldiers' Home in Holyoke, Massachusetts. He currently resides in Massachusetts.

8.   The Defendant, Vanessa Lauziere, is the former Chief Nursing Officer of the Soldiers' Home in Holyoke, Massachusetts. She currently resides in Massachusetts.

9.   The Defendant, Celeste Surreira, is the former Assistant Director of Nursing of the Soldiers' Home in Holyoke, Massachusetts. She currently resides in Massachusetts.

10.  The Defendant, Francisco Urena, is the former Massachusetts Secretary of Veterans' Affairs. He currently resides in Massachusetts.

11.  The Defendant, Marylou Sudders, is the Secretary of Health and Human Services of Massachusetts. She currently resides in Massachusetts.

## JURISDICTION AND VENUE

12.  This Court has subject matter jurisdiction over this action under 28 U.S.C §1331 because the claims arise under the laws of the United States, i.e., the Fourteenth Amendment to the United States Constitution and 42 U.S.C § 1983.

13. This Court has supplemental jurisdiction over any state law claims the plaintiffs might bring pursuant to 28 U.S.C § 1367 (a).

14. This Court has personal jurisdiction over the defendants because they each reside in Massachusetts and, during the relevant time period, they each worked in Massachusetts where the incidents underlying the Complaint occurred.

15. Venue is proper in the Western Division of this Court because all parties reside in either Hampshire County or Hampden County, except for Secretary Urena and Secretary Sudders, who reside in another county within Massachusetts.

## FACTUAL BACKGROUND

### A. BACKGROUND REGARDING THE SOLDIERS' HOME IN HOLYOKE

16. The Soldiers' Home in Holyoke was established by statute in 1946 and is governed by G.L. c. 6, §§ 17, 70, and 71.

17. Chapter 70, § 70 creates a seven-member Board of Trustees, comprised of residents of Berkshire, Franklin, Hampden, and Hampshire counties. Its members are appointed by the Governor of Massachusetts.

18. Chapter 70, § 71 charges the Board of Trustees with the appointment of a Superintendent, who serves as the "administrative head of the home" and who shall, "subject to the approval of trustees, appoint and may remove a medical director . . ."

19. Bennet Walsh was appointed Superintendent of the Soldiers Home on May 29, 2016. Mr. Walsh served as Superintendent until March 30, 2020.

20.     Chapter 70, § 71 provides that the "medical director shall have responsibility for the medical, surgical and outpatient facilities and shall make recommendations to the Superintendent regarding the appointments of all physicians, nurses and other medical stuff"

21.     Dr. David Clinton served as Medical Director of the Soldiers' Home during the relevant events set forth in this Complaint.

**B.      STATE AND FEDERAL COVID-19 GUIDANCE**

22.     The SARS-COV-2 coronavirus is referred to throughout this Complaint as "COVID-19"

23.     Beginning in February 2020, the Commonwealth and the United States government began promulgating guidance directed at protecting people from COVID-19, guidance which expressly directed institutions to (a) identify patients with COVID-19, and (b) isolate patients with COVID-19 from other patients and staff.

24.     As the report clearly established, isolating suspected cases of COVID-19 was epidemiology 101. The Soldiers' Home received clear directives to that effect, including the following:

a: "On March 6, 2020, Elvira Loncto (a federal VA employee) distributed COVID-19 guidance to Mr. Walsh that advised limiting staff movements between COVID-19 contaminated and unaffected areas, screening and limiting visitors, assessing residents daily for symptoms, developing an isolation plan for suspected cases, and encouraging social distancing." Report at 60 (emphasis added).

b. "On March 12, 2020, Paul Moran (Department of Veterans' Services Chief of Staff) forwarded an email to Mr. Walsh attaching Covid-19 guidance for assisted-living facilities, congregate care programs, agency based in-home caregivers and workers, community day program, and assisted living facilities guidance <u>directed isolating symptomatic individuals. The assisted-living facility guidance specified that a symptomatic resident should be moved to a single-person unit with the door closed</u>". <u>Report at 61 (emphasis added)</u>

c. "On March 12, 2020, the CDC released guidance detailing what healthcare personnel should know about caring for patients with confirmed or possible cases for COVID-19. <u>This March 12, 2020, guidance recommended isolating patients suspected of COVID-19, among other precautionary measures. In particular, the guidance recommended "placing a face mask on the patient and placing them in an examination room with the door closed in an airborne infection isolation room (AIIR), if available".</u> Report at 61 (emphasis added).

d. "The Department of Public Health issued another policy memorandum on March 16, 2020, focused on long-term care facility guidance issued on March 11, 2020. The memorandum: (i) restricted visitation by all visitors and non-essential health care personnel, except in certain compassionate care situations; (ii) suspended all communal dining, internal, and external group activities; (iii) recommended the use of eye protection, gowns, and gloves while caring for residents; (iv) required facilities to perform temperature checks at entryways (individuals with temperatures over 100.3 degrees Fahrenheit were not permitted to enter the facility) and (v) <u>recommended that patients with known or suspected COVID-19 be cared for in single-person rooms with the door closed</u>"

## C.    FAILED PREPARATION AT SOLDIERS' HOME

25.    The Soldiers' Home leadership team, including the Defendants, Bennet Walsh (Superintendent), David Clinton (Medical Director), Vannesa Lauziere (Chief Nursing

Officer), met in early March to discuss measures to prevent the introduction and spread of COVID-19 at the Soldiers' Home.

26.    Dr. Clinton was tasked "with monitoring CDC and Department of Public Health guidelines and providing updates to the team. Report at 74. These guidelines would and/or should have included the guidelines described in paragraph 26 above.

27.    Despite the repeated guidance from the Commonwealth and the Federal Government, no isolation rooms were ever used during Mr. Walsh's tenure as Superintendent.

28.    In addition, staff at the Soldiers' Home had inadequate access to Personal Protective Equipment and staff were discouraged from using Personal Protective Equipment. Report 70-71.

D.         **"VETERAN 1"**

29.    As explained in detail below, the first veteran at the Soldiers' Home diagnosed with COVID-19 (referred to in the report as "Veteran 1") had clear symptoms that he carried the virus in February 2020, but he was not tested until March 17, 2020, and even after receiving his positive test result on March 12, 2020 the defendants allowed Veteran 1 to continue living among other veterans and staff, because in Dr. Clinton's opinion consideration of whether to isolate him was a "moot point" since everyone has been exposed to COVID-19 already." Report at 78-80

30.     More specifically, Veteran 1, who resided in the dementia unit, first showed symptoms

consistent with COVID-19 in February, including a high-pitched cough and fever.

Report at 78. Despite these classic COVID-19 symptoms Veteran 1 was not tested for

COVID-19. Instead, he was tested for "pneumonia, strep, and the flu" in February and

early March. Report at 78.


31.     On March 15, 2020, a veteran nursing aide reported to Ms. Surreira that Veteran 1 "was

weak, feverish, and coughing more then he had been previously". He was still not tested

for COVID-19. Report at 79.


32.     Even after Veteran 1 was finally tested for COVID-19 on March 17, 2020, inadequate

precautions were taken to mitigate the potential spread of the virus from Veteran 1 to

other veterans, (or staff) with whom he had come in contact. Report at 79-80


33.     To the contrary, following Veteran 1's COVID-19 diagnosis the defendants repeatedly

made decisions that further exacerbated the spread of COVID-19 at the Soldiers' Home:


As soon as his positive test result was received four days after Veteran 1 was initially

swabbed, Veteran 1 was moved to a different room. Prior to this, one of Veteran 1's

roommates were "very mobile" and frequently visited other rooms. According to Ms.

Lauziere none of Veteran 1's roommates were exhibiting COVID-19 symptoms at this

time.

After testing positive, staff attempted to keep Veteran 1 in his room. The door to Veteran 1's room was supposed to remain closed, but staff largely ignored this policy and kept the door open for faster access.

When Veteran 1 tested positive Dr. Clinton and Ms. Lauziere again discussed whether Veteran 1 should be moved to the isolation unit. Dr. Clinton advised against doing so, as in his view others in 1-North had been exposed already and the facility would be at risk if Veteran 1 got out of his room on an unsecured unit.

Staff who worked on 1-North during the weekend of March 21-22, 2020, after the test result confirmed that Veteran 1 was positive for COVID-19, continued to "float" and work in other areas of the facility, potentially spreading COVID-19. A nursing aide who primarily works on 2-North recalls being floated down to 1-North on March 26th. She was tested for COVID-19 on March 27th, and the result came back positive one week later. A laundry worker reports that he changed the curtains on 1-North on March 22nd and then proceeded to visit each of the other units for laundry purposes during the following week. This laundry worker later tested positive for COVID-19. A registered nurse recalled that even after Veteran 1 tested positive, nursing aides would be scheduled to work two hours on 1-North and then directed to complete the balance of their shift on the third floor. The nurse asked her supervisors, including Ms. Lauziere, why staff were floated between positive and negative units given the risk of spreading COVID-19. Ms. Lauziere responded that the Home "had to work with the number of staff" they had. Report at 81-82

## E.   MR. WALSH FALSELY REPORTED TO SECRETARY URENA THAT VETERAN 1 HAD BEEN QUARANTINED

34.   Later in the evening of March 21, 2020, after Veteran 1's COVID-19 test came back positive, Mr. Walsh informed Secretary Urena of Veteran 1's diagnosis, but in doing so falsely stated that the Soldier's Home had isolated Veteran 1 from others. According to the report:

Mr. Walsh emailed Secretary Urena, (copying Paul Moran of The Department of Veteran's Services Chief of Staff) Stuart Ivimey, and The General Counsel for the Department of Veteran's Services, stating: "As briefed earlier in the week, (veteran with covid symptoms) we received the test results back on our veteran and the results are positive for COVID-19. **We have isolated said veteran and quarantined the unit.** We currently are (sic) testing 5 other veterans and sending out their samples this evening for testing. We'll have the full report once all the information is collected, and protocol actions taken/implemented". (Emphasis added) Mr. Walsh did not explain that the Soldiers' Home did not have adequate staffing to use the isolation rooms that had been set up on the third floor. Report at 96 (emphasis in original).

35.     Later that day, in response to questions from Mr. Moran, Mr. Walsh responded that "the protocol is to isolate the veteran (which we did) and staff has the necessary PPE at this time" and following that communication, Mr. Walsh wrote directly to Secretary Urena and again falsely represented, "The veteran was isolated as soon as the positive test was received." Report at 97.

### F.     COVID-19 DEVASTATED VETERANS AND STAFF AT THE SOLDIERS' HOME

36.     On March 27, 2020, the ill-fated decision was made to combine the Soldiers' Home's two dementia units, despite the fact that several veterans in those units had already been diagnosed with COVID-19 and were obviously at high risk of transmitting the virus to others. According to the report:

"Unit 2-North, one of the two locked dementia units, was closed and all if it's 21 veterans were moved to unit 1-North-doubling the number of veterans in 1-North (which previously held 21 veterans). This required that veterans be crowded into rooms and common spaces, with their bed's inches apart". Report at 87.

37. Mr. Walsh, Dr. Clinton, Ms. Lauziere, and Ms. Surrierra were each involved in the decision to combine the two dementia units. Report at 88.

38. During the independent investigation, Mr. Walsh admitted that Ms. Lauziere informed him of the decision to combine the two dementia units, that he did not overrule the decision and that he was aware that 1-North and 2-North contained a mix of those who were tested, pending test, and not showing signs, but he maintained that the ultimate decision to combine the units was a medical decision submitted to Dr. Clinton. Report 88-89

39. Dr. Clinton denied responsibility for combining dementia units, but the report rejects as implausible. Dr. Clinton's assertion that he was aware of it, and as the ultimate clinical authority for the Soldier's Home he should have involved himself. Report at 88-89.

40. The Report properly concluded that Ms. Lauziere's decision to combine the two dementia units was "inconsistent with her training, inconsistent with her duty to the veterans at the Soldier's Home". Report at 89.

41. The Report laid out in detail the devastating impact that the combination of the two dementia units had on veterans and staff:

Staff described the move as "total pandemonium" when "hell broke loose," and "a nightmare." They reported that "all of a sudden they just started moving people." One staff member reported thinking: "How can they do this because this is the most insane thing I ever saw in my entire life?" She "felt it was like moving the concentration camp-we are moving these unknowing veterans off to die. I will never get those images out of my mind-what we did, what was done to those veterans."

A number of staff members reported discussions with Ms. Lauziere in which they questioned the decision to combine the two units or tried to convince her to change course. One staff member reports that she "marched over" to unit 1-North and asked Ms. Lauziere "what is going on…. there are a lot of people here who are not showing symptoms and you are going to move them in with people who are, and put them right on top of each other?"

With assistance from Ms. Surriera, Ms. Lauziere "directed traffic" during the move. Housekeeping also was instructed to remove tables and chairs from the dining room on unit 1-North so that veterans' beds could be lined up in the dining room. Ms. Surriera told housekeeping staff that if they were not going to be on the floor for more than 15 minutes, they did not need an N95 mask and could use a surgical mask instead. Some housekeeping staff refused, and ultimately received N95 masks to wear during the move.

After the consolidation, unit 1-North was packed with 42 veterans. The veterans' beds and nightstands were directly next to each other and there were no privacy curtains between them. Some of the veterans could not elevate their beds. At times, the names above the beds did not match the veteran who was in the bed. Although, the veterans wore ID bracelets and later the veterans' names were posted outside of their rooms. The dining room was made into a bedroom with nine beds in it. Veterans were sitting in common day rooms in their gowns.

One nursing aide reflected: "We always took pride in our care with honor and dignity, and I thought my god where is the respect and dignity for these men? We are leaving them sitting there in johnnies more confused because there is 40-something of them now."

Social worker Terri Gustafson (who has worked at the Home for 21 years) reports that she saw Ms. Surriera point to a room and state: "All this room will be dead by tomorrow." Similarly, at approximately 7:00 p.m. on March 27th, social worker Jill

Orzechowski heard Ms. Lauziere, while standing outside a room on 1-North say: "something to the effect that this room will be dead by Sunday so we will have more room here".

42.      The report concluded:

We find substantial evidence that the conditions and quality of care on the combined 1-North unit during the weekend of March 28th-29th were deplorable. Clinical staff report that they tried to do the best they could under the circumstances, but they were unprepared, understaffed, and without sufficient resources and guidance. Some staff members reported that they were struggling to provide adequate care, including to keep veterans hydrated and to provide sufficient morphine, and comfort medications to certain veterans who were dying. Staff reported difficulties tracking which veteran had been fed. One staff member said she observed a COVID-19 positive veteran who "had fecal matter on his socks and was laying on another vet's bed". Staff reported that they felt like it was "difficult" and "impossible", to keep the veterans in the consolidated unit where "bed hoppers", meaning that in the fog of dementia, they would climb into various beds on the units. Some nursing aides expressed a concern that they could not keep track of which veterans were positive and which veterans were negative for COVID-19.

Social worker Carrie Forrant provided...

"It was surreal... I don't know how the staff over in that unit, how many of us will ever recover from those images. You want to talk about never wanting this to happen again." Report 90-91

43.      The first confirmed COVID-19 death occurred on March 24, 2020, three days before the two dementia units were combined. Report 92.

44.      The dementia units were combined on March 27, 2020.

45.      Veteran 1 died on March 28, 2020. Report at 93.

46.      The rapid spread of COVID-19 and the rise in the death toll after the two units

combined was anticipated by the Soldiers' Home's leadership:

"13 body bags" were delivered to the 1-North unit on Friday, March 27, 2020, "shortly
before the consolidation of the two units began," and on March 28, 2020, "a tractor trailer
refrigeration unit (ordered earlier in the week) arrived outside of the Soldiers' Home to
the store the remains of veterans who passed away, as there was not enough space in the
morgue" to the store the bodies of the veterans who had perished. Report at 94.

### G.  REMOVAL OF MR. WALSH AS SUPERINTENDENT

47.      Mr. Walsh was placed on administrative leave on March 30, 2020. Report at 109.

48.      As Mr. Walsh was placed on administrative leave, "a response team organized by

Secretary Sudders, acting Secretary Tsai, and Undersecretary Mick had arrived at the

facility to take command of the rapidly devolving situation." The team quickly "triaged

patients, compiled essential records, instituted infection control measures, and sent ill

patients to the hospital." Their actions significantly reduced the scope of the outbreak.

Report at 110.

49.      The National Guard assisted by "swabbing all employees and residents. With the plan to

re-swab negative individuals every 48 hours. The Guard's medical units (consisting of

doctors and nurses) assumed an active role in patient care in place of the scores of

Soldiers' Home staff members who were sick with COVID-19." Report at 110.

50.      The team that covered the Soldiers' Home reported shocking conditions. According to

the Report:

Ms. Liptak and her team have a "collective 90-plus years of nursing" but "none of us have ever seen anything" like this. Upon arrival, "we did not know what patients were in the Home or where they were". She and her team put in 15-hour days trying to accurately count, assess, and cohort the patients. The existing census records were "incomplete", "disorganized" at best. It was "complete mayhem". There were "not assessments being made on all patients."

The 1-North unit "looked like a war zone." According to Ms. Colombo this "hot" unit had veterans "crammed in on top of each other, some of whom "were clearly dying." There were "chairs of people lined up, some were wearing masks, some weren't".

Ms. Colombo asked Ms. Lauziere (the Chief Nursing Officer) to explain the reasons for combing 1-North and 2-North, but "did not get an adequate response, other than it was done because of staffing… she appeared to know it wasn't the right thing to do. But did it anyway". It appeared to Ms. Colombo that "they pooled (veterans) together based on dementia status instead of COVID status."

Based on a review of records from the previous week, Ms. Liptak concluded that the Soldiers' Home was badly understaffed during the previous days. Where there should have been 4 to 5 HPPD (Health Provider Hours Per Patient Day), "there were not even at 1 HPPD".

Ms. Liptak observed some staff with gowns but no masks; some only masks; and some with only gloves on. Her initial assessment was that there was "no understanding of what the infection control guidelines were". When Ms. Liptak scheduled an interview with Ms. Gosselin (Infection Control Nurse) to discuss the events that had transpired, Ms. Gosselin reported that Ms. Surriera (Assistant Director of Nursing) "Did not want to have anything to do with the infection control nurse".

Ms. Gosselin told Ms. Liptak that she "would rather be dead" than continue being (Report at 111) at the facility. Ms. Liptak referred Ms. Gosselin to trauma and grief counselling.

51. Defendants Walsh, Clinton, Lauziere, and Surriera consistently failed to exercise minimally adequate professional judgment in the administration of the Soldiers' Home, during the pandemic and in the provision of care and treatment to the veterans in the Home.

52. The actions, inactions, judgments, and decisions of defendants Walsh, Clinton, Lauziere, and Surriera directly created unsafe conditions of confinement for the veterans at the Soldiers' Home, deprived them of basic care, denied them minimally adequate treatment, and exposed them to harm.

53. As a direct result of the actions and inactions of defendants Walsh, Clinton, Lauziere, and Surriera, between March 1st and June 12, 2020, 160 veterans at the Soldiers' Home were infected with COVID-19, 76 of whom died as a result.

## H. SECRETARY SUDDERS AND SECRETARY URENA

54. The crisis at the Soldiers' Home would have been averted had Secretary Urena and Secretary Sudders not acted with deliberate indifference and substantially departed from accepted professional standards.

55.     Secretary Sudders served as the head of the Massachusetts Executive Office of the
        Health and Human services throughout the timeframe relevant to this dispute.

56.     Secretary Urena served as the head of the Massachusetts Department of Veteran's
        Services under the supervision and direction of Secretary Sudders throughout the
        time frame relevant to this dispute.

57.     Secretary Sudders has all the times acknowledge that the crisis at the Soldiers' Home
        was the result of a breakdown in management at the Soldiers' Home and a failure to
        follow federal and state guidelines relating to the management of COVID-19.

58.     In her sworn testimony on January 21, 2021, to the Massachusetts General Court
        Special Joint Oversight Committee on the Soldiers' Home in Holyoke, COVID-19
        Outbreak ("Joint Oversight Committee) Secretary Sudders testified that "there was
        no internal processes… to withstand the pandemic" She explained, "there were many
        nursing homes in Massachusetts that faced the pandemic… But their internal
        structures didn't collapse. And what happened at Holyoke was a complete collapse
        because it didn't exist, and so staff were left on the front lines without the clinical
        and management oversight and support to manage through a pandemic" She referred
        to the crisis in management as a "fundamental collapse of structures that should be in
        place."

59.     The crisis in management that Secretary Sudders acknowledge at the Soldiers' Home
        was in large part the result of her own failure, and Secretary Urena to take corrective

action at various points leading up to and during the COVID-19 outbreak at the Soldiers' Home.

60. Mr. Walsh's shortcomings as Superintendent were well known to Secretary Sudders and Secretary Urena prior to the outbreak of COVID-19 at the Soldiers' Home.

61. Before Mr. Walsh was appointed as Superintendent on May 16, 2016, Secretary Sudders and Secretary Urena were aware of the fact that Mr. Walsh had no experience in either health care or health care administration. Report at 36-37

62. On account of "Mr. Walsh's lack of experience" Secretary Sudders "instructed Secretary Urena to ensure that Mr. Walsh's Deputy Superintendent… would have a background in long-term care". Report at 37.

63. John Crotty, who had a background in long-term care, was hired as Deputy Superintendent, but resigned in June 2019. As Secretary Sudders and Secretary Urena were aware, following Mr. Crotty's resignation, The Deputy Superintendent role was left unfilled until the response team organized by Ms. Sudders took over the administration of the Sudders Home on March 30, 2020. Report at 43.

64. Mr. Walsh created a hostile and poorly managed work environment that repeatedly created strife, which was reported both to Secretary Urena as well as to the Executive Office of Health and Human Services.

65.    According to Secretary Urena's testimony before the Joint Oversight Committee, by 2018 the leadership at the Executive Office of Health and Human Services had taken over much of the oversight of Mr. Walsh's employment, and therefore had both a better understanding of Walsh's shortcomings and a more direct role in his supervision.

66.    Secretary Urena found the Executive Office of Health and Human Services' handling of complaints concerning Mr. Walsh troubling. He reported many of these concerns to Secretary Sudders and/or the Executive Office of Health and Human Services' leadership team.

67.    As a result of ongoing concerns about Mr. Walsh's leadership at the Soldiers' Home, the Executive Office of Heath and Human Services commissioned a study of the Soldiers' Home by the Moakly Center for Public Management at Suffolk University, which was conducted by Nicole Rivers. According to the 2019 study:

Ms. Rivers' reports from the staff interviews are striking. She recounts the "staff were crying" during interviews because they "need more help" that they "felt bullied by management," and were "overwhelmed with the amount of care they had to  provide with limited resources." Report at 49-50

Secretary Sudders and Secretary Urena were aware of this study after it was released but took no action.

68.    Issues persisted. According to the Report:

Secretary Urena noted that the high rate of staff turnover under Walsh's leadership was a red flag and "if one more employee had quit [under Mr. Walsh's management], there would be a more serious conversation that had to happen with him." Secretary Urena explained that no other department had staff turnover at the level of the Soldiers' Home in Holyoke. He emphasized that Mr. Walsh would get defensive if asked about the resignations, and the Department of Veteran Services could not conduct exit interviews with the staff because they felt retaliation would ensue if they were to share their views in an exit interview. Report at 38-39

69.    Thus, prior to the outbreak of COVID-19 at the Soldiers' Home, Secretary Sudders and Secretary Urena were well aware of Mr. Walsh's shortcomings as Superintendent and took inadequate steps to protect the veterans at the Soldiers' Home and keep them safe from harm.

70.    Secretary Sudders and Secretary Urena were also aware of Mr. Walsh's shortcomings in addressing the COVID-19 crisis

71.    Secretary Urena was present when Mr. Walsh addressed the Soldiers' Home Board of Trustees on March 10, 2022. At which time Mr. Walsh's prepared presentation did not contain any information about COVID-19. In fact, when he was asked about COVID-19 during that meeting Mr. Walsh did not address the steps he would take to prevent the spread of COVID-19 at the Soldiers' Home, .eg. by "clearing space at the Soldiers' Home to use as isolation areas for infected residents." Report at 65-66.

72.    On March 17, 2020, the date when Veteran 1 was tested for COVID-19 symptoms, Mr. Walsh briefed Secretary Urena about the "veteran with covid symptoms"

(which Secretary Urena attempted to deny during his interview with investigators). Report at 96.

73.   On March 21, 2020, Mr. Walsh reported to Secretary Urena that five other veterans in the same ward who were exhibiting symptoms have been tested. And he provided the names of the direct care staff that worked at the facility from March 17th through March 21st who might have been exposed to symptomatic veterans. Report at 97.

74.   On March 22, 2020, Mr. Walsh also communicated the following information to Secretary Urena regarding Veteran 1:

"The veteran was encouraged to wear a mask, this was complicated by his dementia, he kept removing it and needed constant cues to keep it on his face. Staff tried to keep him separate from the other vets on the unit. The staff were instructed to wear PPE when in contact with this veteran. This veteran has had respiratory symptoms on and off (plus pneumonia) and he has not left the building. His nephew was his only visitor prior to banning visitation and the board of health is following up with him. The veteran was isolated as soon as the positive test was received". Report at 97.

75.   On March 27, 2020, the date when Veteran 1 was tested for COVID-19 symptoms, Mr. Walsh told Secretary Urena that the two (dementia) units were going to be consolidated during the afternoon on March 27th. Secretary Urena was "aware that both 1-North and 2-North contained some COVID-19 positive veterans at the time the units were combined" but did not object to their consolidation. Report at 109.

76.     On March 27, 2020, Secretary Urena also learned that the situation at the Soldiers' Home was so bad that Mr. Walsh had requested the assistance of the National Guard. Report at 100. However, Secretary Urena informed Mr. Walsh that the National Guard would not be providing assistance at the Soldiers' Home. As Secretary Urena stated in his sworn remarks to the Joint Oversight Committee, he immediately communicated his request to the leadership team at the Executive Office at the Health and Human Services and that Health and Human Services ultimately denied the request.

77.     Given this backdrop from the outset of the COVID-19 outbreak, Secretary Sudders and Secretary Urena should have immediately taken effective steps to confirm protocols were in place and actually being implemented at the Soldiers' Home, including confirming that patients with COVID-19 or exhibiting COVID-19 symptoms were being isolated. But no such intervention occurred.

78.     On the evening of March 28, 2020, SEIU local 888 President Brenda Rodrigues contacted Secretary Sudders directly to report the concerns of nursing aides about the deaths of veterans at the Soldiers' Home. Secretary Sudders immediately contacted Secretary Urena. Report at 103.

79.     On March 29, 2020:

"For the first time, the Department of Veterans Services requested daily reporting of the number of pending COVID-19 cases (i.e veterans awaiting their test results). The number of patients recovered from COVID-19, and the number of deaths associated with pending or confirmed COVID-19 cases" Report at 126.

80.     But by that time, it was too late to avoid the crisis that would follow.

81.     The report ultimately concluded that "The Department of Veterans Services failed

in its responsibility to oversee the Soldiers Home" Report at 16. Explaining as

follows:

Secretary Urena recommended and approved Mr. Walsh's appointment despite
his lack of any healthcare administration experience. Once Mr. Walsh was in the
role, Secretary Urena and his Chief of Staff developed concern about his
performance. They felt his communication skills were "poor" and he was
"cryptic" and "not forthright in his communications." They thought he was "in
over his head" and did not spend enough time at the Home. They observed
massive turnover in Mr. Walsh and staff, including leadership positions. They had
to hire an Executive Coach to work with Mr. Walsh on his anger management,
and then had to extend this appointment in response to more complaints. And they
were concerned that Mr. Walsh tried to control the flow of information in and out
of the Home. Secretary Urena asserts that at one point, Mr. Walsh asked the
Secretary of EOHHS to bar Secretary Urena from visiting the Home without
giving Mr. Walsh prior notice. Despite all this, Secretary Urena did not take
sufficient action to address Mr. Walsh's deficit's and allowed the Deputy
Superintendent role to remain open for nine months including the period of the
COVID-19 outbreak.

One resource that should have been available to bring healthcare oversight
experience, was the Executive Director of Veterans Homes. In 2016, the
Legislature created this role within the Department of Veterans Services with
reporting and oversighting the responsibilities for the Soldiers' Home. The statue
requires that an experienced healthcare executive hold this role. But the position
mandated by statue was never filled for budget reasons.

A key oversight function is to make sure the right people are in important jobs. For good reasons the Department of Veterans Services leaders did not believe Mr. Walsh was the right person for the job, but they did not take action to assure that there was competent leadership in place at the Soldiers' Home. Report at 16-17.

I.    **JAMES LINDSAY, a veteran who suffered dementia, died of COVID-19 related illness at Soldiers' Home on April 11, 2020.**

82.    James Lindsay was a veteran who served in the Army during the Korean War.

83.    James Lindsay was a resident of Chicopee, MA and was proud to have been instrumental in the design of the Korean and Vietnam War Memorial monuments honoring Chicopee Veterans and to have been active in helping veterans in the city of Chicopee, Ma.

84.    On September 12, 2018, James Lindsay moved into the Soldiers' Home and was placed in one of the Soldiers' Home dementia units, due to his diagnosis of dementia of the Alzheimer's type.

85.    James Lindsay was diagnosed with COVID-19 on March 31, 2020. But was asymptomatic at the time.

86.    James Lindsay developed increasing respiratory symptoms and died on April 11, 2020.

87.    According to his death certificate, James' cause of death was pneumonia.

**COUNT I**
FOURTEENTH AMENDMENT
TO THE UNITED STATES CONSTITUTION
42 U.S.C. § 1983

88.    The foregoing paragraphs are incorporated as if stated here.

89.    The Due Process Clause of the Fourteenth Amendment provides that no State

shall "deprive any person of life, liberty, or property without due process of the

law".

90.    The defendants' acts and omissions were under the color of state law.

91.    The defendants' violated the rights of James Lindsay who resided at the Soldiers'

Home, by failing to protect them from harm, provide them with a safe

environment, and/or provided them with minimally adequate medical and nursing

care.

92.    The defendants' actions were a substantial departure from accepted professional

standards for the provision of medical and nursing care in a nursing facility.

93.    The Defendants' acts and omissions were done with deliberate indifference, and

constituted deliberate disregard for the health, safety, and federal rights of the

veterans of the Soldiers' Home.

94.    The Defendants' acts and omissions shock the conscience.

95.    Pursuant to 42 U.S.C. § 1983, the plaintiff seeks recovery to the greatest extent

available under the law for the Estate of James Lindsay who either died by

COVID-19 at the Soldiers' Home.

WHEREFORE, the Plaintiff, the Estate of James Lindsay, demands judgement against

the Defendants in the amount of $2,000,000.00 or such amount that this court shall deem

just or proper together with interest and costs and respectfully requests that the Court

grant any other relief to which the Plaintiff is entitled.

The Plaintiff hereby demands a trial by jury on all issues and facts so triable.

Respectfully Submitted,

THE PLAINTIFF
By his attorney,

Dated: May ___//___, 2022

JOHN D. ROSS, III, Esq.
BBO #546211
Ross & Ross, P.C.
121 State Street, Suite 201
Springfield, MA 01103
(413) 736-2725
Fax: (413) 736-1247
Jackross@rossrosspc.com